# In the United States Court of Federal Claims

**No. 10-195C**
**BID PROTEST**

**(Originally Filed Under Seal July 8, 2010)**
**(Reissued July 16, 2010)**

```
* * * * * * * * * * * * * * * * * * * * * * * * * *
TURNER CONSTRUCTION CO., INC.,      *
                                    *
          Plaintiff,                *   Bid Protest; RCFC 52.1;
                                    *   Motion for Judgment on the
     v.                             *   Administrative Record;
                                    *   Organizational Conflict
UNITED STATES,                      *   of Interest; Federal
          Defendant,                *   Acquisition Regulations;
                                    *   FAR Subpart 9.5;
          and                       *   GAO Recommendation;
                                    *   Permanent Injunction
MCCARTHY/HUNT, JV,                  *
                                    *
          Intervenor,               *
                                    *
          and                       *
                                    *
B.L. HARBERT-BRASFIELD              *
& GORRIE, JV,                       *
                                    *
          Intervenor.               *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * * * *
```

    **Scott M. McCaleb**, Wiley Rein LLP, Washington, D.C., attorney of record for plaintiff, and **William A. Roberts, III, Nicole J. Owren-Wiest, Richard B. O'Keeffe, Jr.**, of counsel.

    **Anuj Vohra**, U.S. Department of Justice, Civil Division, with whom was **Assistant Attorney General Tony West**, for defendant. **Jeanne E. Davidson**, Director, **Kirk T. Manhardt**, Assistant Director; and **Thomas H. Gourlay, Jr.**, Chief Trial Attorney, United States Army Corps of Engineers, of counsel.

    **Mark Douglas Colley**, Arnold & Porter, Washington, D.C., attorney of record for intervenor-defendant, McCarthy/Hunt, Joint Venture, and **Cameron W. Fogle**, of counsel.

**Laurence Schor**, Asmar, Schor & McKenna, PLLC, Washington, D.C., attorney of record for intervenor-defendant, B.L. Harbert-Brasfield & Gorrie, Joint Venture, and **Susan L. Schor**, **Dennis C. Ehlers**, and **David A. Edelstein**, of counsel.

## OPINION AND ORDER

**Futey**, **Judge**.

This is a post-award bid protest related to a contract for the replacement of Fort Benning's Martin Army Community Hospital ("the Hospital"). The United States Army Corps of Engineers ("the Army") awarded that contract to Turner Construction Company ("Turner") on September 28, 2009. Turner's two rivals for the contract, McCarthy/Hunt, JV ("McCarthy/Hunt"), and B.L. Harbert-Brasfield & Gorrie, JV ("Harbert/Gorrie"), who now intervene in this case, filed bid protests with the Government Accountability Office ("GAO") in November 2009. The GAO on February 16, 2010 recommended that the Army strip Turner of the contract due to organizational conflicts of interest ("OCIs") and re-procure the contract, with Turner eliminated from the competition. The Army announced on March 19, 2010 that it would follow GAO's recommendation and not waive the OCIs. Turner then filed this bid protest on March 31, 2010.

Turner argues that the Army's decision to strip Turner of the contract was arbitrary and capricious for three primary reasons: (1) because the GAO recommendation, which the Army implemented, lacked a rational basis; (2) because the Army did not conduct a full and independent evaluation of the GAO recommendation prior to implementing it; and (3) because the Army did not reasonably evaluate a request to waive the OCIs that were found. In its defense, defendant argues that the GAO recommendation was rational and that no precedent supports either a requirement to fully document a waiver decision or to evaluate a GAO recommendation.

The parties have made cross-motions for Judgment on the Administrative Record, under Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("the Rules"). When resolving this type of motion, a court must make factual findings based upon the administrative record. *See **Bannum, Inc. v. United States***, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The parties have submitted numerous briefs, and oral argument was held on June 11, 2010.

I.    Background

The Hospital is a 250-bed facility that serves more than 86,000 beneficiaries. The number of beneficiaries will grow to close to 100,000 by 2012.

To provide for that increased demand, the Army sought bids for "the design and construction of a state-of-the-art full service medical treatment facility . . . ."[1]

    A.    *The Army Began the Bidding Process for the Hospital Project in June 2008.*

In June 2008, the Army issued request for proposals ("RFP") No. W912HN-07-R-0112 for a design-build contract to renovate the Hospital. The procurement would proceed in two phases. During Phase I, the Army would receive performance and capability information from potential offerors. The Army would select up to three offerors to move on to Phase II and provide these offerors with the Technical Provisions for the project. Using these requirements, the Phase II offerors would submit their proposals to the Army, who would evaluate the offerors' technical capabilities and estimates and select the proposal that contained the best value for the Army. The RFP highlighted two important non-price factors to be considered in this evaluation: 1) "Design Technical" and 2) "Remaining Performance Capability." According to the Army, "Design Technical" was the most important factor and contained four sub-factors.[2] All of these non-price factors combined were of equal weight to the price of the contract. Although the RFP originally only contemplated an addition to the Hospital, the project expanded in July 2008 to encompass a complete replacement of the Hospital.

The Army held an industry forum in August 2008 to inform potential offerors of the opportunity at Fort Benning. On October 3, 2008, four firms, including Turner, submitted Phase I proposals. Two months later, on December 9, the Army's Source Selection Evaluation Board ("SSEB") selected three of these offerors to continue on to Phase II of the bid process: Turner, McCarthy/Hunt, and Harbert/Gorrie.

    B.    *The Army Awarded a Design Contract to HSMM/HOK to Provide "All Services Necessary" in Preparing the Plans, Specifications and Other Materials for the Hospital Project.*

Due to the complexity of the project, the Army had previously entered into a design contract to obtain technical assistance. This contract, Contract No. W912HN-07-C-0038, was awarded to the Joint Venture of Hayes, Seay, Mattern & Mattern ("HSMM") and Hellmuth, Obata & Kassbaum, Inc. ("HOK") on June 8, 2007. Under the terms of the design contract, HSMM/HOK were to provide "all services necessary in the preparation of design documents, including plans, specifications, supporting design analysis, design narrative, cost estimates, etc. to

---

[1] Administrative Record ("Admin. Rec.") Tab 4.2, at 1695.
[2] The sub-factors were (1) Building Function and Aesthetics, (2) Building Systems, (3) Site Design Submittal Requirements, and (4) Sustainable Design Submittal Requirements.

construct a replacement hospital" at Fort Benning.[3]  [***] the Army's Senior Project Manager for the Hospital project, described this contract as encompassing "preparing the design concept" and assisting the Army with "preparation of [the RFP] and technical evaluation of proposals for the subsequent design-build contract."[4]

At the time the design contract was awarded and throughout the procurement of the Hospital contract, HSMM was owned by AECOM.  AECOM is a "global provider of professional technical and management support services to a broad range of markets, including transportation, facilities, environmental, energy, water and government."[5]  After AECOM acquired HSMM, HSMM employees began to transition to being part of the AECOM corporate structure.[6]

      C.     *The Army Awarded the Hospital Contract to Turner, with Ellerbe Becket as its Subcontractor in Charge of Design.*

The Phase II offerors for the Hospital project submitted their proposals to the Army on July 7, 2009.  Beginning on July 13, 2009, the Army's Technical Review Board ("TRB") met in Savannah, Georgia to evaluate the proposals.  The TRB consisted of 34 members, four of whom were from HSMM.  The TRB submitted comments that were reviewed by the SSEB on July 27–31, 2009. Using these comments, the SSEB prepared a report that ranked the proposals.  Of the three Phase II offerors, Turner [***].  For the four Design Technical sub-factors, which the Contracting Officer ("CO") considered the most important to the project, Turner received an Above Average rating on three, [***].  Turner also submitted the lowest priced proposal, with an estimate of [***] McCarthy/Hunt's proposal and [***] Harbert/Gorrie's proposal.

The three offerors gave oral presentations to the Army on August 17–18, 2009; the four HSMM employees, who were part of the TRB, attended these presentations but did not ask any questions.  On August 24, 2009, after reviewing the SSEB report, cost estimates, and presentations, the Source Selection Authority determined that Turner represented the best value for the Army.  On September 28, 2009, the Army awarded Turner the contract in the amount of $333,359,000.

For the Hospital contract, Ellerbe Becket ("EB") served as a subcontractor to Turner to provide "overall project design coordination for all design

---

[3] Admin. Rec. Tab 3.3, at 208.

[4] Admin. Rec. Tab 3.1, at 170.

[5] Pl.'s Compl. ¶ 26.

[6] *See, e.g.*, Admin. Rec. Tab 3.2, at 178, Email of [***] ("You may notice the changes in my email address and materials at our firm as AECOM shifts towards amore [sic] unified and integrated company.  We at AECOM Design are confident that these shifts will enable youto [sic] have even better access to the comprehensive services currently available throughout our company.").

consultants . . . ."[7]  This work was valued at approximately [***], which would be split between EB and a firm that it was partnered with in a joint venture.  EB expected to make a profit of approximately [***] from the contract.

       D.    *Initial, Unsuccessful Acquisition Discussions Between EB and AECOM Ran from June 2008 Until November 2008, but in May 2009 AECOM Reopened Discussions that were Ultimately Successful.*

      In July 2007, the EB Board of Directors had begun to discuss a "diversification of EB's business interests . . . ."[8]  After receiving approval from the firm's owners, EB hired the investment banking firm William Blair & Company ("WBC") to assist EB with investigating its options.  That firm eventually recommended that EB attempt to sell itself via an auction.  To proceed with this auction, WBC circulated a memorandum with information about EB and its operations; this memorandum did not contain EB's name but simply described it as a "healthcare-focused architectural and engineering [ ] firm . . . ."[9]

          1.    <u>AECOM and Other Firms Began to Negotiate with EB in June 2008, but These Negotiations Terminated in November 2008.</u>

      By June of 2008, five firms, including AECOM, had expressed an interest in acquiring EB.  After they signed confidentiality agreements that required them to "maintain the confidentiality of all EB proprietary information and limit its disclosure . . . on a 'need to know' basis," WBC released EB's name to the firms.[10]  AECOM signed its agreement on May 15, 2008 and then learned that EB was the company up for acquisition.  From June 23 to July 2, 2008, EB's management made confidential presentations to four of the firms, including AECOM, and then opened their data room for the firms to conduct due diligence investigations.  Between twenty-five and thirty AECOM employees took part in these investigations, but none of these employees was part of the HSMM team that participated in the July 2009 technical evaluation of proposals for the Hospital project.

      AECOM and two other firms submitted non-binding letters of interest and price proposals in late August and early September 2008.  AECOM's bid was the second highest, and EB management decided to proceed with negotiations with the top two firms.  At an October 24–25, 2008 meeting, EB's owners informally authorized negotiations with AECOM and the other top bidder.  The outcome of negotiations was far from certain, however, and EB's CEO [***] noted that:

---

[7] Admin. Rec. Tab 8, at 6106.
[8] Admin. Rec. Tab 6.1, at 5681.2.
[9] *Id.* at 5681.8.
[10] *Id.* at 5681.10.

> [B]ased on their due diligence reviews up to that point and downturns in the financial market, each of the bidders had made changes to their proposed prices and other financial terms of the deal.   While the EB management team responsible for the negotiations was not in a position at that point to recommend one firm over the other due to these changes in financial terms, and *AECOM's proposed revisions to the terms were not favorable to EB*—in fact, they made it *impossible for a transaction favorable to EB to be structured with AECOM at that time*—the principals were still interested in continuing confidential negotiations with the two unnamed firms as described, if favorable values could be reached. Nonetheless, management's presentation to the principals suggested that *a fair deal in this market might not be possible*.[11]

At a November 12, 2008 meeting of EB's Board of Directors, the Board voted to pursue binding negotiations with both firms.  These negotiations had failed by the end of November 2008, however, because "favorable terms could not be successfully negotiated" with either bidder.[12]   The result of this, according to [***] was a "*termination* of all discussions with both companies."[13]   The deals with both bidders "were considered *dead* and EB did not entertain any prospect of reinstating discussions with either bidder in the future."[14]   Following this termination, the data room that the bidders had access to was closed.

### 2.   AECOM Reopened Negotiations with EB in May 2009, and These Negotiations Led to a Successful Merger.

Seven months later, in May 2009, [***] received a phone call from [***] of AECOM.   [***] told [***] "that he had been giving some thought as to whether the two companies might be able to renew discussions about a potential deal."[15]   On June 16 and 17, 2009, four senior executives of EB met with four AECOM employees to discuss whether the parties could reach a "fair price."[16]   The next month, on July 7, 2009, AECOM submitted an initial, non-binding Letter of Interest to EB, and the parties negotiated based on the terms of this letter until August 12, 2009, when AECOM submitted a final, non-binding Letter of Interest.

At an August 12, 2009 meeting, EB's Board of Directors approved AECOM's Letter of Interest.   AECOM again received access to EB's electronic

---

[11] *Id.* at 5681.4 (emphasis added).

[12] *Id.*

[13] *Id.* (emphasis added).

[14] *Id.* at 5681.4–5 (emphasis added).

[15] *Id.* at 5681.5.

[16] *Id.*

data room in order to conduct a due diligence investigation. Significant issues in acquisition discussions arose, however, and EB's Board of Directors voted on September 30, 2009 to withhold approval of the acquisition. By October 7, 2009, these issues had been resolved, and the Board and shareholders approved the Merger Agreement by October 22, 2009.[17]   The deal closed the following day and was publicly announced on October 26.

      E.      *Signs of a Potential OCI*

Throughout the Hospital project, [***], a Senior Vice President of HSMM/AECOM, served as the Principal in Charge of the design contract that the Army had with HSMM/HOK. According to him, his responsibilities included "communication, negotiations with the Agency pertaining to the design contract, allocation of resources to fulfill the design contract, and keeping the project on schedule."[18]   He also attended and participated in meetings that dealt with the RFP's Technical Provisions.

      1.      <u>August 2008 Industry Forum</u>

In late July 2008, [***] attended a confidential briefing by EB and then provided input to his superiors at AECOM about the suitability of acquiring EB. After providing that input, [***] had no further involvement in the acquisition. On August 7, [***] attended the industry forum that the Army held to inform industry members about the Hospital project, and he learned for the first time of EB's interest in the project. [***] asked his supervisor "about the potential for a conflict of interest to arise if AECOM acquired Ellerbe Becket," but his supervisor told him that negotiations with EB "had not been productive."[19]  [***] also relates that "[w]ithin a few weeks" he discovered that negotiations had been "suspended," which allayed his concerns about a potential conflict arising.[20]   At that time, [***] did not inform the Army about his concern that a conflict of interest could arise if the potential acquisition of EB occurred.

This time period, however, conflicts with the more detailed description of the EB and AECOM negotiations provided by EB CEO [***] and relied upon by the CO in her investigation. As discussed above, AECOM submitted a final non-

---

[17] The record refers to the deal between AECOM and EB both as a merger and as an acquisition. The document the firms eventually signed was called a Merger Agreement, Admin. Rec. Tab 6.1, at 5681.6, but contemporaneous news stories and others describe it as an acquisition. Admin. Rec. Tab 1.2, at 95. The GAO noted the same discrepancy, and, as before that body, whether this was a merger or sale has no bearing on the analysis. ***McCarthy/Hunt, JV***, B-402229.2 (Comp. Gen., Feb. 16, 2010), at 2.

[18] Admin. Rec. Tab 3.2, at 174.

[19] *Id.*

[20] *Id.*

binding Letter of Interest on August 12, 2008.  EB voted to informally authorize negotiations in late October and then voted on November 12 to pursue legally binding negotiations.  It was not until the end of November that EB considered negotiations with AECOM to be "terminated."   Up until November 2008, AECOM had access to EB's secure data room for purposes of a due diligence investigation.

### 2. February 2009 Email Exchange Regarding OCIs

In February 2009, [***] and Project Manager [***] discussed whether any potential OCIs existed.   [***] inquired among AECOM offices as to what relations, if any, existed between AECOM and the Phase II offerors and their subcontractors.  [***] reported to [***] that only "teaming relationships" existed but that "[w]ith firms the size of HSMM (AECOM) and HOK, we have associations with other architects and contractors all over the country. . . . [W]e do not see this as a problem, but did want to disclose this information."[21]   This exchange, in which [***] told [***] that there was no relationship with EB, occurred on February 6, 2009, approximately three months after EB had closed its data room to and terminated negotiations with AECOM.

### 3. July 2009 Technical Review Board Meeting

On July 20, 2009, [***] arrived in Savannah to attend sessions of the Technical Review Board.  As noted above, four HSMM reviewers had already been present at this meeting for a week and had all signed Source Selection Participation Agreements that certified they had no known conflicts of interest. After being presented with a Source Selection Participation Agreement, [***] made various telephone calls to determine whether an OCI existed.  At this time, [***] states that he "knew that Ellerbe Becket was a subcontractor for Turner Construction Co. and specifically inquired whether AECOM was in negotiations with Ellerbe Becket as of 20 July 2009."[22]   His calls alerted him to the fact that negotiations had resumed, and he immediately informed [***] of a potential OCI and asked to meet with the CO to discuss the situation.

The following day, July 21, [***] met with Nina Jodell, the Army's CO, along with [***] and the Army's Counsel.  He informed them of his concerns that a potential OCI with a subcontractor might arise but did not identify which offeror or subcontractor, due to the confidentiality agreements between AECOM and EB. He also told the Army's personnel that he was the only AECOM employee at the Technical Review Board meeting who knew of the potential merger, and he proposed his own recusal from the meeting.  According to [***], Jodell "agreed that [his] recusal would sufficiently prevent any possible conflict of interest."[23]

---

[21] Admin. Rec. Tab 3.7, at 508.

[22] Admin. Rec. Tab 3.2, at 175.

[23] *Id.*

[***] prepared a short, one-page memorandum following this meeting in which he stated:

> Over a year ago, and before the Industry Forum on this project, AECOM did have an interest in acquiring a company that is currently identified as a consultant on one of the teams. AECOM learned of their possible involvement in the Fort Benning Hospital Project when they attended the Industry Forum. Shortly after this, the acquisition discussions with this firm were not successful, and were suspended. [***] has recently learned that there is interest in renewing negotiations with this firm, and acquisition discussions are in process.[24]

This document also stated that no other member of the HSMM/HOK team was aware of the discussions with EB, and declarations from the other members of that team have attested to the same fact.

F.    *GAO Protests are Filed by McCarthy/Hunt and Harbert/Gorrie Alleging Organizational Conflicts of Interest.*

Shortly after EB's merger with AECOM was publicly announced on October 26, 2009, McCarthy/Hunt and Harbert/Gorrie filed protests before the GAO. Both protesters alleged the existence of "biased ground rules" and "impaired objectivity" OCIs, and McCarthy/Hunt additionally alleged an "unequal access to information" OCI.

1.    Definition of OCIs Under the FAR

The Federal Acquisition Regulations ("FAR") define an organizational conflict of interest as a conflict that may occur when "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." 48 C.F.R. § 2.101 (2009). OCIs "may result when factors create an actual or potential conflict of interest on an instant contract, or when the nature of the work to be performed on the instant contract creates an actual or potential conflict of interest on a future acquisition." *Id.* § 9.502(c).

The FAR tasks COs with the responsibility to "analyze planned acquisitions in order to (1) [i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible; and (2) [a]void, neutralize, or mitigate significant potential conflicts before contract award." *Id.* § 9.504(a). In reviewing acquisitions, the FAR advises a CO to obtain the

---

[24] *Id.* at 177.

assistance of counsel and technical experts when attempting to analyze potential OCIs. *Id.* § 9.504(b).

The discretion of the CO receives great emphasis in the FAR. In considering a contracting situation, the FAR discusses the need to look at the "particular facts" and "nature" of each proposed contract. *Id.* § 9.505. A CO must exercise "common sense, good judgment, and sound discretion" in deciding both whether a potential conflict exists and "the development of an appropriate means for resolving it." *Id. See also **Axiom Res. Mgmt., Inc. v. United States***, 564 F.3d 1374, 1382 (Fed. Cir. 2009) ("[T]he FAR recognizes that the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion [by the contracting officer].").  Because of this emphasis, the GAO will only overturn a CO's OCI decision if that decision was unreasonable. ***McCarthy/Hunt, JV***, B-402229.2, at 5.

The FAR does not attempt to specify every type of OCI that may exist. While it does contain examples of OCIs, the FAR specifically recognizes that "[c]onflicts may arise in situations not expressly covered . . . or in the examples . . . ."  48 C.F.R. § 9.505. To assist COs in identifying potential OCIs, the FAR provides two basic "underlying principles." *Id.* First, a CO should attempt to "prevent[] the existence of conflicting roles that might bias a contractor's judgment." *Id.* Second, a CO should attempt to "prevent[] unfair competitive advantage." *Id.* The FAR defines this as existing "where a contractor competing for award for any Federal contract possesses (1) [p]roprietary information that was obtained from a Government official without proper authorization; or (2) [s]ource selection information . . . that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract." *Id.*

A CO does not need to formally document his reasoning except "when a substantive issue concerning potential organizational conflict of interest exists." *Id.* § 9.504(d). If a "significant potential organizational conflict of interest" does exist, then a CO must submit a written analysis and mitigation plan to the chief of the contracting office for approval. *Id.* § 9.506(b). This official must then review the analysis, weigh the benefits and detriments, and in writing approve, modify, or reject the CO's recommendation. *Id.* § 9.506(c).

### 2. Judicial and GAO Precedent Have Identified Three Types of OCIs.

Cases before the Court of Federal Claims and bid protests before the GAO have interpreted FAR Subpart 9.5 to identify three distinct types of OCIs. *See **Aetna Gov't Health Plans, Inc.***, B-254397 (Comp. Gen., July 27, 1995), *available at* 1995 WL 449806, *8–9; Daniel I. Gordon, *Organizational Conflicts of Interest: A Growing Integrity Challenge*, 35 Pub. Cont. L.J. 25, 32

n.21 (2005) (noting that *Aetna* was the first decision to identify the three categories of OCIs and that decisions before the Court of Federal Claims have adopted that terminology).  These three types, "unequal access to information," "biased ground rules," and "impaired objectivity," are discussed generally in the FAR, but a 1995 GAO decision provided the basic "framework" under which this court has analyzed OCIs.  *See Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 770 (2006) ("FAR subpart 9.5 describes three basic situations in which organizational conflicts of interest arise. . . . GAO's decision in *Matter of Aetna Government Health Plans* further defines these three categories . . . . The court will address [OCI claims] within this framework.").  Although the Federal Circuit has not dealt extensively with OCI claims, a recent decision from that court briefly discussed OCIs within the *Aetna* framework.  *See Axiom Res.*, 564 F.3d at 1377 n.1 (discussing the "unequal access to information" OCI).  Accordingly, this Court will use the *Aetna* framework, which has been relied upon by the GAO in this and other matters.

The first type of OCI, "unequal access to information," has two basic elements.  *See* 48 C.F.R. § 9.505-4.  First, a firm must have access to "nonpublic information" while performing a government contract.  *Aetna Gov't Health Plans*, 1995 WL 449806, at *8.  Second, this information must be of the type that could "provide the firm a competitive advantage in a later competition for a government contract." *Id.*  GAO has frequently stated that the concern for this type of OCI is that one firm might have a "competitive advantage" over another firm, due to a separate government contract.  *L-3 Servs., Inc.*, B-400134.11 (Comp. Gen., Sept. 3. 2009), at 5.

The second type of OCI, "biased ground rules," may occur where a firm, due to its work on one government contract, has "set the ground rules" for another government contract.  *Aetna Gov't Health Plans*, 1995 WL 449806, at *8.  GAO gives the example in *Aetna* of a firm that, under one contract, writes the specifications for another government contract that is being procured.  *Id.*  Two concerns exist with this type of OCI.  First, the primary concern is the potential that a firm could consciously or unconsciously "skew the competition" in favor of itself.  *Id.*  Second, there also is a concern that one firm might have "special knowledge of the agency's future requirements" that would give it an "unfair advantage in the competition for those requirements." *Id.*

The third type of OCI, "impaired objectivity," includes situations where a firm's work under one contract might require it to evaluate itself under another contract.  *Id.* at *9.  The primary concern under this type of OCI is that a firm might not be able to render "impartial advice" due to its relationship with the entity being evaluated.  *Id.*

In *Aetna*, the GAO noted that "[w]hile FAR subpart 9.5 does not explicitly address the role of affiliates in the various types of organizational conflicts of interest, there is no basis to distinguish between a firm and its affiliates, at least

11

where concerns about potentially biased ground rules and impaired objectivity are at issue." *Id.*

### 3.   Proceedings Before the GAO

Jodell submitted two statements to the GAO during the bid protest.  Prior to the bid protest, no comprehensive, documented investigation was conducted by the Army into whether OCIs existed, although Jodell had met with [***] in July 2009 and discussed potential OCI concerns with him and agency counsel.  At the inception of the bid protest, Jodell submitted a short five-page statement, which she later supplemented after conducting a comprehensive investigation.  This investigation spanned 150 pages and included forty-two declarations from involved persons and telephone interviews with the HSMM employees who were part of the Technical Review Board.  As discussed below, Jodell addressed each possible type of OCI and found that no OCIs existed prior to award of the contract.

The GAO disagreed with Jodell's conclusions and sustained the "unequal access to information" and "biased ground rules" protests.  The GAO did, however, deny the "impaired objectivity" claim.  Turner and the Army had argued that, even if an "impaired objectivity" OCI existed, the record demonstrated a lack of prejudice to the protesters, and the GAO agreed.  *McCarthy/Hunt, JV*, B-402229.2, at 12.  The record showed that four HSMM employees did submit evaluations of the Turner proposal, but these evaluations were "relatively critical" of Turner.  *Id.*  GAO thus agreed that the Army had made a "reasonable case for lack of prejudice" and denied the protest on this ground.  *Id.*  This finding is not at issue before the Court.

> G.   *After Receiving Input from the Savannah District of the Army Corps of Engineers and from Members of Congress, the Army did not Waive the OCIs.*

While the GAO decision was pending, government officials began to discuss whether or not to seek a waiver of any OCIs.  The Savannah District of the Army Corps of Engineers sent a letter to their headquarters and requested a waiver.  The GAO also ordered briefing on what remedy should be recommended, if the GAO did find an OCI.  In their response to this order, the Army stated that "[b]ecause of the unique facts of this case, waiver is the appropriate remedy for any organizational conflict of interest which may be found to exist in this procurement."[25]   According to the Army, the CO had no reason to suspect that there were any potential OCIs, especially given the non-disclosure of past discussions with EB when the Army inquired into OCIs in February 2009.  Furthermore, the Army found that any potential OCIs had been mitigated: the unequal access to information and biased ground rules OCIs were mitigated

---

[25] Admin. Rec. Tab 10.1, at 6255.

"through the efforts of AECOM and EB to keep the discussions confidential and limit knowledge within their organizations," and the impaired objectivity OCI was mitigated by [***] recusal from the procurement.[26]   Due to the mitigation efforts, the technical superiority of Turner's proposals, and the potential for costly delays from re-procurement, the Army stated that a waiver would be the most appropriate remedy.

During this period, several members of the United States Congress contacted the Army with regard to a waiver decision.  For instance, United States Senator Jeff Sessions wrote the Secretary of the Army to state his position that seeking a waiver would be "unwise."[27]   Other members of Congress merely inquired as to the status of the GAO proceeding.[28]

Lieutenant General ("LTG") Robert Van Antwerp has served as the relevant Head of Contracting Activity for the procurement.  As such, the power to waive an OCI rests in LTG Antwerp's hands, and the FAR specifies that the decision whether or not to waive cannot be delegated to his subordinates.  48 C.F.R. § 9.503.  As the GAO proceedings unfolded, LTG Antwerp received numerous briefings regarding and requests for a waiver from the Savannah District of the Army Corps of Engineers.  Following the GAO decision, LTG Antwerp was given dozens of pages of background materials and then briefed on the merits of a waiver at a March 8, 2010 meeting.[29]   Ultimately, LTG Antwerp decided not to grant the waiver.

On March 19, 2010, the Army announced that it would follow the GAO's recommendation, rather than waive the OCIs.  A few days later, on March 23, the Army notified Turner that its contract for the Hospital was terminated.  On March 31, Turner filed this protest.

II.   Discussion
    A.   *The Standard of Review*
        1.   The Arbitrary and Capricious Standard of the Administrative Procedure Act Governs Review of Bid Protest Decisions in this Court.

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation

---

[26] *Id.*

[27] Admin. Rec. Tab 22, at 6820.

[28] *See* Admin. Rec. Tab 27, at 6848 ("We were inquiring about the protest filed . . . . We also understand that the Corps of Engineers is planning to seek a waiver . . . . Any information you can share is greatly appreciated.").

[29] *See* Admin. Rec. Tab 44.

in connection with a procurement or a proposed procurement."   28 U.S.C. § 1491(b)(1) (2006).   The Tucker Act also mandates the standard of review this court must apply: section 706 of the Administrative Procedure Act ("APA").   28 U.S.C. § 1491(b)(4).   That section of the APA specifies that a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A) (2006).   *See also* ***Centech Group, Inc. v. United States***, 554 F.3d 1029, 1037 (Fed. Cir. 2009); ***Bannum, Inc. v. United States***, 404 F.3d 1346, 1351 (Fed. Cir. 2005) ("[T]he inquiry is whether the . . . procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"); ***Banknote Corp. of Am. v. United States***, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (noting that "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A)").

This standard does not allow a reviewing court to sift through an agency's rationale with a fine-toothed comb.   Instead, the APA standard recognizes "the possibility of a zone of acceptable results in a particular case." ***ARINC Eng'g Servs., LLC v. United States***, 77 Fed. Cl. 196, 200 (2007).   A court must "determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made." ***Baltimore Gas & Elec. Co. v. Natural Res. Def. Council***, 462 U.S. 87, 105 (1983).   The Federal Circuit has described this review as "highly deferential" and as requiring "a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." ***Advanced Data Concepts, Inc. v. United States***, 216 F.3d 1054, 1058 (Fed. Cir. 2000).   Despite this deference, in some situations an agency's decision should be overturned, such as when the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." ***Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.***, 463 U.S. 29, 43 (1983).   As long as "the court finds a reasonable basis for the agency's actions, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." ***Honeywell, Inc. v. United States***, 870 F.2d 644, 648 (Fed. Cir. 1989) (quotation marks omitted).

2.   <u>Federal Circuit Precedent Articulates the Arbitrary and Capricious Standard for the Bid Protest Context.</u>

The Federal Circuit has articulated the APA standard for the bid protest context.   An award decision "may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." ***Impresa Construzioni Geom. Domenico Garufi v. United States***, 238 F.3d 1324, 1332 (Fed. Cir. 2001). *See **Centech Group***, 554 F.3d at 1037; ***Axiom Res. Mgmt., Inc. v. United States***, 564

F.3d 1374, 1381 (Fed. Cir. 2009). Contracting officers are allowed to exercise a wide amount of discretion in this arena. *Impresa*, 238 F.3d at 1332. If a party brings a challenge on the first ground, a court must determine "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion . . . and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Id.* at 1333 (quotation marks omitted). If, on the other hand, a challenge is brought upon the second ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations" in order to succeed. *Id.* (quotation marks omitted). In this case, no procedural violation has been alleged; instead, Turner argues that the Army lacked a rational basis.

3.     An Agency's Decision to Follow the Recommendation of the GAO in a Bid Protest Decision is Arbitrary and Capricious if the GAO Decision was Irrational.

The Federal Circuit has further tailored the arbitrary and capricious standard for times when a court must review an agency's decision to follow a GAO recommendation. In that situation, the agency decision lacks a rational basis if it implements a GAO recommendation that is itself irrational. *Centech Group*, 554 F.3d at 1039; *Honeywell*, 870 F.2d at 648; *SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 14 (2009) ("In the rare instance where the agency considers a GAO decision to be so thoroughly wrong as to be irrational (or the court later concludes the GAO decision is irrational), then the agency is not justified in relying upon the decision."); *Grunley Walsh Int'l, LLC v. United States*, 78 Fed. Cl. 35, 44 (2007). The burden of showing that the GAO was irrational falls upon the protester, and past cases have described this burden as "heavy." *See Grunley Walsh*, 78 Fed. Cl. at 39. The burden is, in part, heavy because GAO decisions are accorded a high degree of deference in this court, even though they are not binding upon it. *Id.* This deference remains even when the GAO's recommendation differs from the CO's initial decision. *Honeywell*, 870 F.2d at 648.

The Federal Circuit has stressed that "the controlling inquiry [is] whether the GAO's decision was a rational one" and that a court must not "impermissibly [undertake] its own independent *de novo* determination" of the matter. *Honeywell*, 870 F.2d at 647. *See also Centech Group*, 554 F.3d at 1039 (affirming the viability of *Honeywell*); *SP Sys.*, 86 Fed. Cl. at 14 (noting that "[t]he cases continue to reaffirm the viability of *Honeywell* long after the passage of the [Administrative Dispute Resolution Act]" and that "[i]f the GAO makes a rational recommendation and the agency simply implements that recommendation, then the agency action itself has a rational basis"). Where an agency simply implements a GAO recommendation, the inquiry focuses on the rationality of that GAO recommendation, even though the actual decision before the court is the agency decision. *SP Sys.*, 86 Fed. Cl. at 14. This is because "inquiring after the rationality *vel non* of the GAO decision is, where the agency

15

action is solely based upon that decision, examining whether there exists a rational basis for the agency's acts." ***Id.***[30]

In this case, then, the Court's task is to inquire whether the Army acted arbitrarily and capriciously in implementing the GAO's recommendation. To do so, the Court must address the "controlling inquiry" of whether or not the GAO decision was rational. ***Honeywell***, 870 F.2d at 647. If the GAO had a rational basis for its recommendation then the Army was not arbitrary and capricious in implementing it, and this Court must affirm.

> 4.   An OCI Must be Established by "Hard Facts," and the GAO Should Only Overturn an Agency's Decision if it is Unreasonable.

The GAO reviews whether an agency's decision regarding OCIs was reasonable. In this case, GAO recognized that standard, writing that "[t]he responsibility for determining whether an actual or apparent conflict of interest will arise, and to what extent the firm should be excluded from the competition, rests with the contracting agency. . . . We will not overturn the agency's determination except where it is shown to be unreasonable." ***McCarthy/Hunt, JV***, B-402229.2 (Comp. Gen., Feb. 16, 2010), at 5. In situations like this one, where the contracting agency has found that no OCI exists, the GAO must

---

[30] If an agency undertakes further actions after the GAO makes its decision, then a court's review will necessarily encompass that further analysis. This was the case in *SP Systems*, in which the agency, as a corrective measure in response to a GAO recommendation, looked at new information and re-scored and re-evaluated the proposals. ***SP Sys.***, 86 Fed. Cl. at 7–11. "The question presented," the court wrote, "is whether the agency's procurement decision was reasonable based upon the record before it, and the GAO decision is only part of that record." ***Id.*** at 14. Defendant and intervenors in this case have repeatedly cited this language to assert that this Court should look at the administrative record broadly to determine whether an OCI existed, regardless of the rationality of the GAO decision. This is a misreading of *SP Systems*. The court there explicitly stated that the case before it was not one in which the agency had simply implemented the GAO's recommendation. Instead, "there exist both the GAO decision and further analysis by NASA subsequent to the GAO decision that involved data that had not been before the GAO; the GAO decision and that subsequent analysis together constitute the record upon which the [agency decision] was made." ***Id.*** In contrast, when an agency simply implements a GAO decision, the court found that "inquiring after the rationality . . . of the GAO decision is . . . examining whether there exists a rational basis for the agency's acts." ***Id.*** The case before this Court is one in which the agency simply implements the GAO decision; in that situation, an inquiry into the rationality of the GAO decision is the same as an inquiry into whether the agency had a rational basis for its decision.

identify "hard facts" to establish an OCI and show that the agency acted unreasonably.

An OCI must be established by "hard facts" that indicate the existence or potential existence of a conflict. *See C.A.C.I., Inc. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983); *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 380 (2004). These "hard facts" do not need to show either an actual conflict or a negative impact from a conflict. *See Lucent Techs. World Servs., Inc.*, B-295462 (Comp. Gen., Mar. 2, 2005), at 10 ("[T]he facts necessary to establish an OCI are those that pertain to the existence of the conflict, rather than its precise impact."). The Federal Circuit has been absolutely unambiguous in ruling that a bidder may be disqualified if the mere *appearance* of impropriety is indicated by hard facts. *See NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 377 (Fed. Cir. 1986) ("Though the Claims Court erroneously limited [a contracting officer's authority to disqualify bidders] to cases involving actual, but not the appearance of, impropriety, we do not repeat that mistake here."). The "hard facts" that indicate the existence or potential existence of impropriety stand opposed to inferences based upon "suspicion and innuendo." *C.A.C.I.*, 719 F.2d at 1582. Numerous GAO decisions have reinforced this standard before that body. *See, e.g.*, *L-3 Servs., Inc.*, B-400134.11 (Comp. Gen., Sept. 3, 2009), at 11; *VRC, Inc.*, B-310100 (Comp. Gen., Nov. 2, 2007), at 3; *Aetna Gov't Health Plans, Inc.*, B-254397 (Comp. Gen., July 27, 1995), *available at* 1995 WL 449806, at *8.

If "hard facts" establish the appearance of impropriety, it is not irrational for a reviewing body to overturn an award. The Federal Circuit's decision in *NKF Engineering* is instructive in this regard.[31]  In that case, a Navy employee worked extensively on an RFP but then took a job with NKF Engineering, one of the bidders for the contract. *NKF Eng'g*, 805 F.2d at 373–74. When the Navy requested final offers, NKF submitted a proposal that was 33 percent less expensive than their initial proposal. *Id.* at 374. After NKF was awarded the contract, Navy employees raised concerns about potential OCIs, and the CO reviewed the situation. *Id.* at 374–75. The Federal Circuit found that it was not irrational for that CO to conclude that "this *appearance of and potential for* an unfair competitive advantage so tainted the procurement process that the integrity of the process had been damaged" and that NKF must be eliminated from

---

[31]  *NKF Engineering* involved a personal conflict of interest of a former government employee, not an organizational conflict of interest between two private parties. The Federal Circuit, however, has applied *NKF*'s holding to cases involving "only private parties." *Compliance Corp. v. United States*, No. 91-5048, 1992 WL 56946, at *1 (Fed. Cir., Mar. 26, 1992). That court, albeit in an unpublished decision, noted that "the integrity of the bidding process also implicates actions of individual bidders. . . . [A]ll that is necessary to justify disqualification is an appearance of improper conduct." *Id.* at *2. Decisions before this court have also applied *NKF Engineering* in the context of OCIs. *See, e.g.*, *Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 768 (2006).

competition. *Id.* at 375 (emphasis added). The hard facts of the movement of an employee who was a "major cog in the bid process, with access to much relevant information" combined with the "drastic bid reduction" created a "certain aroma that is hard to purify." *Id.* at 377. The Federal Circuit held that where facts show that a potential conflict of interest *may* exist, the mere "appearance of impropriety" is enough for a CO to disqualify a bidder, *regardless* of "[w]hether or not inside information was *actually* passed . . . ." *Id.* at 376 (emphasis added).

B.    *The Army's Decision to Follow GAO's Recommendation Was Arbitrary and Capricious.*

Turner argues that the Army's decision to implement the recommendation of the GAO was arbitrary and capricious for three primary reasons: first, the GAO decision itself was "raw judgment substitution" and irrational because it failed to defer to the discretion of the CO; second, the Army failed to "fully and independently evaluate" that decision before implementing it; third, the Army failed to reasonably evaluate the waiver request before it.

1.    The Rationality of the GAO's Decision

The GAO, according to Turner, failed to adhere to the relevant standard of review. As discussed above, the applicable standard of review is reasonableness: the GAO should not overturn an agency's decision, unless it was unreasonable. *McCarthy/Hunt, JV*, B-402229.2, at 5. According to Turner, the GAO conducted a *de novo* review of the record that supplanted the CO's decision, which was based on "hard facts," with a decision based on "mere inference and suspicion." In doing so, Turner contends that the GAO committed three major errors in reviewing the record and that these errors render the recommendation irrational. As noted above, the task before this Court is to determine whether the GAO had a rational basis to overturn the agency's findings. If it did, the Army was not arbitrary and capricious in implementing the GAO recommendation, and the Army's decision must stand.

a.    *Preliminary Matters*

Before addressing the GAO's holdings themselves, the Court must resolve two preliminary disagreements between the parties: a potential disagreement concerning the "hard facts" requirement, and an actual disagreement concerning the timing of the CO's OCI investigation.

i.    Has Plaintiff Misstated the "Hard Facts" Requirement?

18

Defendant and intervenors have repeatedly asserted that plaintiff has misstated the "hard facts" requirement.  According to defendant, plaintiff argues that hard facts showing "actual harm" from an OCI must be present to establish an OCI.  Defendant, in contrast, argues that only the appearance of a conflict must exist.

Plaintiff has, however, simply contrasted a decision based on "hard facts" with a decision based on "speculation and innuendo."  This contrast is the classic dichotomy from *C.A.C.I.*, 719 F.2d at 1582.  In that case, the Federal Circuit found that "the possibility and appearance of impropriety is not supported by the record and therefore is not a proper basis for enjoining award of the contract" and that the Claims Court erred in basing "its inferences of actual or potential wrongdoing . . . on *suspicion and innuendo*, [rather than] on *hard facts*."  *Id.* at 1581–82 (emphasis added).  Defendant has itself cited cases that support plaintiff's juxtaposition of hard facts and suspicion.  For instance, defendant quotes the Federal Circuit's statement that a bidder should not be rejected "where the facts of the case do not support a finding of an appearance of impropriety."  *NKF Eng'g*, 805 F.2d at 376.  In its sur-reply, plaintiff argues that "the assessment of OCIs is a fact-specific inquiry the CO must undertake, and under the facts here, the CO reasonably concluded there was no OCI, and GAO erred in substituting its judgment for that of the CO."[32]  The Court therefore agrees with plaintiff—and precedent—that a proper GAO decision is based on "hard facts" that show an "appearance of impropriety."  *NKF Eng'g*, 805 F.2d at 376.

ii.  Were the Timing and Substance of the CO's Investigation Improper?

Much more serious disagreements concern the timing and substance of the contracting officer's investigation.  There are three general areas of disagreement regarding this investigation: first, whether the investigation should have occurred before contract award; second, whether the GAO should have considered the post-protest declarations submitted to it as part of that investigation; third, whether the focus of the investigation should have been on rebutting a presumption of prejudice.

As noted above, the CO submitted to the GAO a detailed examination of whether any OCIs existed, but this investigation was only conducted post-award and post-protest.  In their filings, defendant and intervenors have attacked the timing of this investigation for a number of reasons.  For instance, according to the government, "the FAR directs that the CO shall identify and evaluate potential conflicts as early in the acquisition as possible and before contract award," and the CO erred by not acting prior to award.[33]  The GAO, the government argues,

---

[32] Pl.'s Reply 9–10 n.4.

[33] Def.'s Opp'n Pl.'s Mot. J. 31 (quotations removed).

correctly found that the CO acted unreasonably in finding no potential OCIs during this post-award investigation.

The government claims that one of this Court's prior cases controls.  In that case, *Filtration Development*, the award of a contract for engine barrier filters to Aerospace Filtration Systems ("ASF") was at issue.  ***Filtration Dev. Co., LLC v. United States***, 60 Fed. Cl. 371, 373 (2004).  ASF was a division of Westar Corporation, who, under a prior contract, received task orders and participated in meetings related to these filters.  ***Id.*** at 374.  The government officials in charge of that earlier contract grew concerned about the potential for OCIs and tried to "implement precautionary measures" through "two unsigned and unapproved mitigation plans."  ***Id.*** at 374.  The CO for the contract at issue "was informed that the Army had recognized the conflict and that the appropriate measures were in place."  ***Id.*** at 374–75.  Based on these assurances, the CO found no significant potential OCI.  ***Id.*** at 375.  A bidder for the contract alleged that the CO had failed to address or mitigate the potential OCI; the bidder argued that "the CO cannot abdicate her responsibilities . . . simply because government personnel represented that the conflict had been addressed through the submission of mitigation plans."  ***Id.*** at 377.  This Court agreed and found that the CO had failed to address OCIs "as early in the acquisition as possible" because clear signs of a conflict were present prior to the award.  ***Id.*** at 378.  The Court further concluded that the CO "exceeded her authority by concluding that the appropriate safeguards were in place to eliminate the conflict," when "all those involved recognized the significant conflict."  ***Id.*** at 378.

The government argues that *Filtration Development* is directly on point for this case, but that argument hinges on a misreading of the FAR and of *Filtration*.  According to the government, the FAR requires the CO to "identify and evaluate" potential conflicts "before contract award."[34]  This assertion merges two separate requirements of FAR Section 9.504.  The first, under section (a)(1), requires a CO to "[i]dentify and evaluate potential organizational conflicts of interest as early in the acquisition process as possible," and the second, under section (a)(2), requires a CO to "[a]void, neutralize, or mitigate *significant* potential conflicts before contract award."  48 C.F.R. § 9.504(a)(1)-(2) (2009) (emphasis added).  The government improperly combines these two requirements.  The FAR does not require a CO, in every single procurement, to review and document whether OCIs exist prior to award.  Instead, a CO must evaluate OCIs as early in the process as possible, and, for *significant* potential OCIs, a CO must mitigate them prior to award.  In some cases, the earliest time to evaluate an alleged OCI might be post-award, such as when a bid protest is brought that alleges theretofore unknown OCIs.  In other cases, such as in *Filtration*, evidence

---

[34] Def.'s Opp'n Pl.'s Mot. J. 31.  *See also* Def.'s June 4, 2010 Reply 11 ("The investigation . . . did not occur . . . prior to contract award, as required by FAR § 9.504(a).").

of a "significant" OCI will exist before contract award and require a CO to evaluate and mitigate it then. *Filtration Dev.*, 60 Fed. Cl. at 378.

A second, related timing issue infected the GAO's decision. Turner and the Army had argued before the GAO that those AECOM employees who assisted the agency did not know of the potential merger, but GAO dismissed this argument as based on "post-protest representations" and stated that they "need not resolve this issue." *McCarthy/Hunt, JV*, B-402229.2, at 10–11.

This dismissive attitude departs from prior GAO decisions which have considered post-protest representations. For instance, in *Pemco Aeroplex*, a protester alleged that an OCI existed because an employee of the winning bidder for a contract may have acted as a consultant and reviewed the proposals for that contract. *Pemco Aeroplex, Inc.*, B-310372 (Comp. Gen., Dec. 27, 2007), at 14. The agency responded with factual assertions showing that no such employee had in fact reviewed the proposals. *Id.* The GAO acknowledged that the assertions were made "in responding to [the] protest" and considered them in finding that no OCI existed. *Id.* Similarly, in *Integrated Concepts*, the GAO relied on an "agency report" that "explained that the alleged facts underpinning the protester's OCI allegations were not as argued." *Integrated Concepts & Res. Corp.*, B-309803 (Comp. Gen., Oct. 15, 2007), at 6. The GAO also noted that "[s]ubstantial facts and hard evidence are necessary to establish a conflict." *Id.* Finally, in *Chenega Federal Systems*, a protester alleged that the government had awarded a contract to a firm with an OCI. *Chenega Fed. Sys., LLC*, B-299310.2 (Comp. Gen., Sept. 28, 2007), at 5. According to the protester, the awardee hired an employee who may have had access to confidential information. *Id.* In response to the protest, the agency told the GAO that it would investigate the OCI allegations and then make a new source selection decision. *Id.* at 2. After the agency investigated and awarded the contract to the same firm, the protester filed another bid protest. *Id.* The GAO relied on this investigation, which was not contemporaneous with the events in question and which was conducted after the initial award and protest, and upheld the award. *Id.* at 5.

Dismissing the "post-protest representations" of a party or the agency defies reason. If a protester were to allege an OCI so baseless that it had never been considered before, an agency might not be able to respond except with "post-protest representations." It was irrational in this case to depart from precedent and not consider the factually-based arguments of Turner and the Army, especially when the GAO was tasked with looking for "hard facts" of an OCI.

Finally, the parties dispute the exact application of a presumption of prejudice that can attach in OCI cases.[35] The Court of Federal Claims and the

---

[35] The presumption of prejudice is different from the requirement that a party protesting a contract award "must first show that it was prejudiced by a significant

GAO have frequently stated that, when an OCI is found, prejudice stemming from that OCI is presumed.  *See, e.g.*, **Filtration Dev.**, 60 Fed. Cl. at 379; **L-3 Servs.**, B-400134.11, at 17 n.19.  This frees a party alleging an OCI from having to prove actual prejudice and places the onus on the other party to rebut the presumption of prejudice.  Presuming prejudice coincides with the emphasis on avoiding even the appearance of impropriety in federal procurements.  *See NKF Eng'g*, 805 F.2d at 377.  The court in **ARINC Engineering Services, LLC v. United States** illustrates this presumption: a "protestor need not show that the information possessed by its competitor *specifically benefitted* the latter's proposal—that prejudice is presumed primarily because the contracting officer must avoid and address not only actual, but apparent, conflicts of interest."  77 Fed. Cl. at 203 (emphasis added).  The GAO also adheres to this view and has provided this example: "an unfair competitive advantage is presumed to arise where an offeror possesses competitively useful nonpublic information that would assist that offeror in obtaining the contract, without the need for an inquiry as to whether that information was, actually, of assistance to the offeror."  **L-3 Servs.**, B-400134.11, at 17 n.19.

Defendant and intervenors have made, at times, expansive arguments about this presumption of prejudice.  McCarthy/Hunt, for instance, has asserted that "[w]hen an OCI investigation is post-hoc, *i.e.*, it occurs after the act potentially tainted by an OCI has occurred, then *the only thing left to investigate is the issue of prejudice*."[36]  Defendant has also argued that "the CO's focus was not rebutting the presumption of prejudice that attached to the AECOM-EB merger discussions" and that reliance upon that investigation is therefore "misplaced."[37]  Due to a lack of clarity in these arguments, the Court ordered the parties to conduct supplemental briefing on the issue.  In its supplemental brief, defendant correctly states the law: "in a post-award, post-protest OCI investigation, an agency is required to consider both whether a potential OCI exists, and if so, whether the presumption of prejudice that attaches to an identified OCI can be rebutted."[38]

---

error in the procurement process."  **Labatt Food Serv., Inc. v. United States**, 577 F.3d 1375, 1378 (Fed. Cir. 2009).  *See also* **Weeks Marine, Inc. v. United States**, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (discussing the prejudice required to come within the Court of Federal Claims' bid protest jurisdiction).  That question of prejudice relates to standing.  **Id.**  The presumption of prejudice, on the other hand, occurs only in OCI cases, not in bid protests generally.  *See ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 (2007) (noting that the prejudice requirement that the presumption relates to "is reminiscent of the prejudice requirement generally applicable in bid protests cases . . . [but] in the conflicts context, the prejudice inquiry is more narrow").

[36] Supplemental Br. McCarthy/Hunt 3 (emphasis added).

[37] Def.'s June 4, 2010 Reply 13.

[38] Def.'s Supplemental Br. 2.

The critical, antecedent question of whether or not an OCI exists must be answered before presuming prejudice, and the more expansive arguments from defendant and intervenors sometimes miss this mark.  In this case, as discussed below, the CO found that no OCI existed.  The GAO's first task was thus to address the issue of whether or not the CO acted reasonably in finding no OCI. Only after that initial inquiry is made can a presumption of prejudice attach. McCarthy/Hunt is thus incorrect that "the only thing left to investigate" is prejudice.  Defendant has now stated the law correctly: the first question the agency was required to look at is whether a potential OCI exists, and, if it does, the agency must address prejudice.

> b. *Were HSMM and EB's Interests "effectively . . . aligned"?*

Turner first claims that the GAO erred in finding that AECOM and EB's interests "effectively were aligned" as early as August 2008.  Before the GAO, Turner had argued that the CO was correct in finding the relationship between the two firms too attenuated to support an OCI, and the GAO disagreed with this conclusion.

This issue is difficult for two reasons.  First, the GAO has not articulated what precisely it looks for when OCI allegations are raised about potentially affiliated firms or persons, and defendant and intervenors have attempted to apply a reductionist reading of the FAR to this inquiry.  Second, no prior decision appears to have found that sporadic merger discussions between firms create an effective alignment of interests, yet neither the GAO nor defendant has discussed or justified the expansive nature of that holding.

The starting point of an OCI analysis is the definition of an OCI found in the FAR.  Those regulations define an OCI as a conflict that may occur due to "relationships with other persons."  48 C.F.R. § 2.101.  Since the seminal OCI decision in *Aetna*, GAO decisions have covered both close "relationships" that do raise OCI concerns and more tenuous "relationships" that do not.  In *Aetna*, the GAO found that a potential OCI did exist where the government had hired a consulting company to assist with the procurement, and the winning bidder had proposed using a wholly owned subsidiary of that consultant to perform a significant subcontract worth over $180 million.  ***Aetna Gov't Health Plans, Inc.***, B-254397 (Comp. Gen., July 27, 1995), *available at* 1995 WL 499806, at *14.  In contrast, the GAO found the relationship between firms too attenuated in its decision in ***American Management Systems, Inc.***, B-285645 (Comp. Gen., Sept. 8, 2000).  In that case, the government had initiated two separate procurements: one for financial software and one for the integration of that software into the government's systems.  ***Id.*** at 2.  Under the integration contract, the vendor was also supposed to assist the government with selection of the software itself.  ***Id.*** An unsuccessful bidder for the software contract filed a protest because of an agreement between the winning bidders for the integration and software contracts.

Under that agreement, the two firms had adopted "a structure for submitting proposals under a prime contractor/subcontractor relationship . . . [and] a formula for splitting revenues under contracts resulting from such proposals." *Id.* at 5. The agency and GAO reviewed this agreement and found that, despite their alliance for contractor/subcontractor proposals, the potential for a significant OCI was too remote and speculative for contracts, like the one under review, which did not involve a contractor/subcontractor proposal. *Id.* at 6.

A recent GAO decision contains one of the more extensive discussions of relationships in the OCI context. In that case, *L-3 Services*, a protester had alleged, among other things, that an impaired objectivity OCI existed due to the relationship between two firms. *L-3 Servs., Inc.*, B-400134.11 (Comp. Gen., Sept. 3, 2009), at 14. The two firms had worked together on a prior contract and were trying to work together in the future; the protester alleged that a conflict existed, when one firm was called on to review the other firm. *Id.* The GAO found that this relationship was not sufficiently close to raise OCI concerns:

> There is no evidence in the record of a corporate relationship between the firms, such that one firm is evaluating itself or an affiliate, or evaluating products made by itself or a competitor, or is making judgments that would otherwise directly influence its own well-being . . . . The protester urges us to consider that an organizational conflict of interest exists because the two firms contemplated additional work together on the [ ] procurement, but we decline to do so; at least in this circumstance, *what the two firms considered doing has no bearing on our analysis of whether their actual relationship met the standard* for an organizational conflict of interest. Moreover, we look for some indication that there is a direct financial benefit to the firm alleged to have the organizational conflict of interest [ ] and there is none in this instance.

*Id.* at 15 (citations removed) (emphasis added). The GAO compared the facts that the protester alleged to those prior decisions of the GAO concerning relationships between firms and OCIs. Those decisions show actual relationships: a contractor reviewing its own work on another contract; an awardee making recommendations regarding its own product or its competitors' products; a firm determining the stringency of testing requirements for tests that it itself would conduct. *Id.* at 14 (citing *Nortel Gov't Solutions, Inc.*, B-299522.5 (Comp. Gen., Dec. 30, 2008); *Alion Sci. & Tech. Corp.*, B-297022.3 (Comp. Gen., Jan. 9, 2006); *Ktech Corp.*, B-285330 (Comp. Gen., Aug. 17, 2000)). In contrast, the GAO found that the firm in *L-3* did not have a sufficiently close relationship to raise OCI concerns. *L-3 Servs.*, B-400134.11, at 15.

Distilling these cases, GAO decisions on this issue have looked for a direct financial benefit between firms, rather than an attenuated or potential

benefit.   A relationship involving a firm and its subsidiary is certainly close enough to raise potential OCI concerns, while the relationship between two firms that have merely considered future work together does not raise similar concerns. Defendant and intervenors have, however, ignored almost entirely the GAO case law described above.   They repeatedly cite to the "relationship" language of FAR § 2.101 without discussing the GAO case law that has construed that term.[39]   It is certainly true that AECOM and EB had some type of "relationship," but the presence of a relationship does not end the inquiry.   As the GAO has stated in numerous prior cases, that relationship must be sufficiently direct to raise OCI concerns.

In this case, the Army concluded that AECOM and EB were only "potential merger partners, with no community of interests."[40]   Despite that conclusion, the GAO overturned the CO's analysis.   Unlike that analysis, which had extensively discussed the facts of the case, the GAO simply stated: "[I]n our view, the record shows that, as early as August 2008, AECOM's and EB's interests effectively were aligned as a result of the merger/acquisition discussions sufficient to present at least a potential organizational conflict of interest." *McCarthy/Hunt, JV*, B-402229.2, at 6.   The GAO also dismissed the CO's findings that the negotiations were extended and non-continuous.   *Id.*

This Court's task is not to conduct a *de novo* review of the record and make a finding as to whether or not AECOM and EB's relationship was sufficiently close.   Instead, the Court must strictly adhere to the standard of review and inquire whether the GAO had a rational basis for finding the CO's determination unreasonable.   In this case, it is, of course, true that both acquisition talks and procurement actions occurred during the past several years, but the

---

[39] For instance, in its reply, defendant argues that plaintiff "ignores" the FAR by discussing whether or not the affiliation between AECOM and EB was "solid" enough.   Def.'s June 4, 2010 Reply 14.   Defendant writes that "once again Turner ignores FAR § 2.101, which considers simply the <u>relationship</u> between parties, and does not require 'solid affiliation' for the creation of an OCI."   *Id.*   It is true the FAR does not contain a requirement for a "solid affiliation," but simply reciting the word "relationship" is unavailing.   It would be absurd if any relationship whatsoever raised the specter of an OCI; clearly some barometer to measure the seriousness of a relationship must exist.   For instance, imagine that AECOM and EB had never merged but merely happened to have offices in the same large office building, or imagine that AECOM and EB never resumed their merger negotiations.   In these situations, the firms have a relationship, but it is one that is insufficiently close to raise OCI concerns.   The GAO case law that defendant and intervenors ignore attempts to set up a barometer to determine how close is close enough for an OCI.   The FAR also contains a similar acknowledgement that relationships must be sufficiently serious, since it only requires a CO to mitigate "significant" OCIs.   48 C.F.R. § 9.504(a)(2).
[40] Admin. Rec. Tab 2.4, at 137.

GAO ignored the CO's findings and merely stated that "in [their] view" the record indicated a sufficient alignment of interests. This cursory inquiry differs from the GAO decisions discussed above. Those cases discussed the facts of the case to inquire into the closeness of the connection between firms, the directness of a financial relationship, and the specific facts that could indicate whether a relationship was close enough or too attenuated to support an OCI. The GAO did not do that in this case. This failure to engage the CO and the record is especially noteworthy when a recent decision, cited by the GAO in this very case, found no OCI between two firms planning future work together because "what [] two firms considered doing has no bearing on our analysis of whether their actual relationship met the standard for an organizational conflict of interest." *L-3 Servs.*, B-400134.11, at 15. In OCI matters, the Federal Circuit has noted that a CO must exercise "considerable discretion" and that a CO's determinations must not be overturned unless they are unreasonable. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1382 (Fed. Cir. 2009). This Court thus finds that the GAO lacked a rational basis because it overturned the CO's determination without highlighting any hard facts that indicate a sufficient alignment of interests. Because the GAO lacked a rational basis, the Army was not justified in following its recommendation.

       c.  *Did the GAO Have a Rational Basis for Finding Unreasonable the CO's Biased Ground Rules OCI Determination?*

Turner also argues that the GAO erred in overturning the CO's decision and finding a biased ground rules OCI.[41] This type of OCI exists where a firm could "skew the competition" in favor of itself or where a firm could have an unfair competitive advantage due to its "special knowledge" of an agency's future needs. *Aetna Gov't Health Plans*, 1995 WL 449806, at *8.

In her factual analysis, the CO separated the negotiations between EB and AECOM into two distinct periods during which negotiations overlapped with action in the procurement process. The first period ran from May 2008, when interested firms began to contact EB, until November 30, 2008, when AECOM and EB terminated discussions. During this period, the CO found that no AECOM employees assisting the government were aware of the negotiations. Even if they had been aware, the CO found that such large changes occurred to the procurement after November 2008 that any action taken by those employees from May 2008 until November 2008 would have been unable to skew the procurement in favor of EB. The second period ran from June 2009, when negotiations between AECOM and EB restarted, through August 2009, when Turner was awarded the contract. During this period, the only changes relevant to EB that occurred were initiated by the agency. Based on these findings, the CO

---

[41] As noted above, the GAO's finding that no impaired objectivity OCI exists is not at issue in this case.

concluded that it was "inconceivable" to think that AECOM employees, who were unaware of a potential acquisition, could skew the competition in favor of EB.[42]

The GAO, however, overturned the CO's findings.  According to the GAO, the record "suggests" that AECOM had "special knowledge of the agency's requirements" and that this "special knowledge" would have given Turner an unfair advantage.  *McCarthy/Hunt, JV*, B-402229.2, at 9.  The only piece of the record that the GAO cites is AECOM's contract with the agency to provide "'all services necessary in the preparation of design documents, including plans, specifications, supporting design analysis, design narrative, cost estimates, etc. to construct a replacement hospital.'"  *Id.* at 9–10.  Relying solely on this piece of evidence, the GAO rebutted the agency's arguments and found a biased ground rules OCI.  Having found that, the GAO then presumed that prejudice existed.  *Id.*

Turner argues that it was irrational for GAO to reach this conclusion.  The Court agrees for two primary reasons.  First, the GAO failed to adhere to the proper standard of review.  The GAO's task was to review the agency's decision for reasonableness.  That agency decision, as described above, tracked the precise state of negotiations between AECOM and EB, the exact dates upon which critical changes to the RFP occurred, the exact employees that could have known of the merger, and numerous other facts.  Using this data, the CO concluded that no OCI existed.  The GAO failed to address this OCI decision; in fact, the GAO decision on a biased ground rules OCI *does not even cite* the agency decision that it was tasked with reviewing.  Instead, the GAO cites exactly one piece of information—the text of AECOM's contract with the agency—to support its finding that the record "suggests" that AECOM had "special knowledge" that would have given Turner an unfair advantage.

This failure to meaningfully engage with the agency decision dramatically differs from prior GAO decisions.  For instance, in its recent decision in *L-3 Services*, the GAO also overturned an agency decision, but, in doing so, followed a remarkably different pattern of logic.  Instead of ignoring the agency's decision, as the GAO did here, the GAO in that case engaged the CO's decision both in facts and in reasoning.  *See L-3 Servs.*, B-400134.11, at 7 ("The Air Force contracting officer testified that in making his organizational conflict of interest determination he relied on the 'clean break' between Phases Ia and Ib.  The record shows that the 'clean break' was illusory.") and at 8 ("[T]he Air Force contracting officer's determination that there was no biased ground rules organizational conflict of interest was based on . . . a misreading of *American Artisan Prods., Inc.*").  Similarly, in *Johnson Controls World Services, Inc.*, the GAO overturned an agency's OCI decision but specifically explained its bases for disagreeing with the agency.  The protester in that case had alleged that the winning bidder of a contract had access to information that gave it an unfair competitive advantage.

---

[42] Admin. Rec. Tab 8, at 5964–65.

*Johnson Controls World Servs., Inc.*, B-286714.2 (Comp. Gen., Feb. 13, 2001), at 3.  After outlining the agency's rationale, the GAO disagreed with the decision and spent several pages citing to the record and discussing why the agency's determination was unreasonable.  *Id.* at 4–7.  The GAO decision in this case contains no similar discussion of the agency's findings.

Second, the one piece of information that GAO cited is not a "hard fact." The decision of this Court in *Filtration Development* is instructive in this regard. *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371 (2004).  As discussed above, the plaintiff in that case had alleged that the winning bidder for a contract had "'potential access to source selection information'" that created an OCI.  *Id.* at 380.  The Court found that this allegation, without more, could not satisfy the *C.A.C.I.* "hard facts" requirement.  *Id.*   The GAO's sole fact in this case is similarly vague, especially in light of the CO's findings.  The GAO cited to an appendix to the design contract that contained the "General Requirements" for that contract; these requirements specify that the contractor would be responsible for "all services necessary in the preparation of design documents, including plans, specifications, supporting design analysis, design narrative, cost estimates, etc. to construct a replacement hospital . . . ."[43]  This sole fact is insufficiently weighty to buttress the GAO's finding of an OCI, because it fails to accord the CO's contrary determination any deference and because it lacks any specificity whatsoever.[44]

Rational basis is not a particularly demanding standard of review.  In this case, however, the GAO decision fails to withstand even that level of scrutiny. The GAO was tasked with reviewing the agency decision for reasonableness, but it failed to discuss the agency's decision in any meaningful way.  Furthermore, the one piece of record evidence that the GAO cited was not a "hard fact" showing an appearance of impropriety, as the law requires, but instead was mere

---

[43] Admin. Rec. Tab 3.3, at 208.

[44] The GAO decision in *L-3 Services* provides a worthwhile point of comparison; there the GAO wrote that prejudice would be presumed from an OCI "where an offeror *possesses* competitively useful nonpublic information that would assist that offeror in obtaining the contract, without the need for an inquiry as to whether that information was, actually, of assistance to the offeror." *L-3 Servs.*, B-400134.11, at 17 n.19 (emphasis added).  The critical difference between that example and the GAO decision here is that the GAO has not shown that Turner "possesses" competitively useful information or had "special knowledge" of the agency's requirements.  The GAO, instead, appears to presume that the actual facts of an OCI exist due to the merger negotiations and then, layering presumption upon presumption, presume that the protesters were prejudiced.  The latter presumption is only allowed upon answering the antecedent question of whether or not an OCI exists.  A protester is only presumed to be prejudiced once the facts of an OCI—such as possession of competitively useful information—are established by hard facts.  Prior to that showing, no presumption applies.

"suspicion or innuendo." As discussed above, the first question an agency must address in an OCI investigation is whether or not an OCI exists.[45] The Army addressed that here, and the GAO lacked a rational basis for finding the Army's determination unreasonable.

> d. *Did the GAO Have a Rational Basis for Finding Unreasonable the CO's Unequal Access OCI Determination?*

Turner contends that GAO erred in finding an unequal access OCI. As noted above, this type of OCI can occur when a company has access to non-public information that is competitively useful. *See **Aetna Gov't Health Plans***, B-254397 (Comp. Gen., July 27, 1995), *available at* 1995 WL 449806, at *8.

In this case, the CO found that no unequal access OCI existed. To support this conclusion, the CO looked at the two general types of information that AECOM could have had access to: (1) customer preferences and/or technical requirements and (2) Phase II technical proposals. For the first category of information, the CO concluded that only forty-nine AECOM employees had access to it, and no evidence indicated that the information was ever communicated to EB.[46] She also found that the information could not have provided a competitive advantage to EB. This information was only related to a design concept, not an actual design, and the Army wanted each offeror to provide its own design. Furthermore, this information was memorialized in the Phase II Technical Provisions, which all Phase II offerors were given, and disclosed to the other offerors on multiple occasions from December 2008 until July 2009. Regarding the second category of information, the CO found that this could have given EB a competitive advantage if EB had access to it before final proposals were submitted. The Army, however, "strictly controlled access" to these proposals and prevented AECOM employees from accessing them until after final proposals were submitted.[47]

The GAO overturned the CO's determination and found that AECOM had an "unequal access to information" OCI. To support this conclusion, GAO cited three general sources of information: (1) as the design contractor, AECOM was "familiar with the details of the procurement," (2) some of AECOM's employees "may have had access to competitively useful information," and (3) AECOM was "in a position to obtain information regarding the agency's priorities, preferences, and dislikes." ***McCarthy/Hunt, JV***, B-402229.2, at 7–9.

---

[45] "[I]n a post-award, post-protest OCI investigation, an agency is required to consider both whether a potential OCI exists, and if so, whether the presumption of prejudice that attaches to an identified OCI can be rebutted." Def.'s Supplemental Br. 2.

[46] Admin. Rec. Tab 8, at 5966.

[47] *Id.* at 5972.

As with the biased ground rules claim, the GAO failed to cite any hard facts to support its unequal access claim. As discussed above, hard facts showing actual harm are not required; for instance, the GAO did not need to show that EB had access to data that was "actually [] of assistance." *L-3 Servs.*, B-400134.11, at 17 n.19. The GAO did, however, need to show the "possession" of undisclosed, competitively useful information. *Id.* Instead, the GAO pointed only to vague allegations that someone "may have had access" to unidentified information or that someone "was familiar with the details." These nebulous allegations are similar to the claim of "potential access to source selection information" that this Court found insufficient in *Filtration*. *Filtration Dev.*, 60 Fed. Cl. at 380. According to the Federal Circuit, mere "suspicion" that a company may have had access to information is insufficient. *C.A.C.I., Inc. v. United States*, 719 F.2d 1567, 1582 (Fed. Cir. 1983).

The lack of concreteness in GAO's decision can be seen quite clearly in comparison to prior GAO decisions. For instance, in *L-3 Services*, the GAO found an unequal access OCI when an employee of the winning bidder had, among other things, "handled competitively useful information in the form of unredacted copies of contracts, core communications requirements . . . and proprietary information of other companies that was subject to non-disclosure agreements." *L-3 Servs.*, B-400134.11, at 9–10. In another GAO decision, *Johnson Controls*, the GAO sustained an OCI protest when the winning bidder had access to a non-public database that contained data with a "significant level of detail" not available to other bidders, and the GAO listed and discussed this information in detail. *Johnson Controls World Servs., Inc.*, B-286714.2 (Comp. Gen., Feb. 13, 2001), at 4.

Furthermore, apart from simply using the phrase "competitively useful," the GAO cites to no facts to support their conclusion that EB had access to anything of competitive worth. As noted above, there are two elements of an "unequal access" OCI: a firm must have (1) access to non-public information that is (2) competitively useful. *Aetna Gov't Health Plans*, 1995 WL 449806, at *8. In a recent Court of Federal Claims decision, the court noted that "there is no indication that whatever informational differences that may have existed . . . gave rise to a competitive disadvantage that was unfair." *ARINC Eng'g Servs. v. United States*, 77 Fed. Cl. 196, 205 (2007). Lacking such an indication, the court found that it would be unreasonable to find an OCI. *Id.* In this case, the CO specifically discussed how each type of information to which AECOM may have had access not only lacked competitive utility but was also disclosed to all of the offerors. The GAO decision does not reference this discussion except to say that EB may have gained an unfair advantage from knowing "what the agency did not communicate" to other offerors. *McCarthy/Hunt, JV*, B-402229.2, at 9. In support of this assertion, GAO cites no facts.

These prior GAO decisions are based on hard facts that show the possession of information that is both nonpublic and competitively useful. They cite specific examples of information that could have given one bidder an unfair competitive advantage. They do not require a court to draw inferences from innuendo and suspicion in order to presume the existence of such information. The GAO decision here, in contrast, only points to "familiar[ity] with the details" and potential "access to competitively useful information" and being "in a position to obtain information."[48]   This is not specific enough to have overturned the agency's OCI determination, and it was irrational for the GAO to do so. Because the GAO decision was irrational, the Army was not justified in relying on it.

> 2.   Plaintiff Argues that the Agency Failed to Fully and Independently Evaluate the GAO's Recommendation Before Adopting It.

Turner also argues that the Army had an obligation to "fully and independently evaluate" GAO's recommendation. This language is drawn from a 1995 Court of Federal Claims case in which the court wrote:

> Although noncompliance with a GAO recommendation may not be the preferred action of the agency, it may be the correct action. Therefore, it is the agency's responsibility to fully and independently evaluate all recommendations given by the GAO. While this court recognizes that a procurement agency normally will accept the advice of the GAO, it is imperative that the agency perform its own evaluation of the procurement process before making final decisions. If, in its own expertise, the procurement agency determines that the GAO's recommendation is misguided, it has a responsibility to make up its own mind and to act on its own advice.

*IMS Servs., Inc. v. United States*, 33 Fed. Cl. 167, 184 (1995). Based on this language, Turner argues that the Army failed to evaluate whether the

---

[48] Consistent with the presumption of prejudice, the Court readily agrees that if an OCI were shown to exist, the protesters would not have to prove that they were prejudiced by that OCI. For instance, if the GAO had shown that EB via AECOM had access to confidential information, there would be no need to ask whether or not that access had prejudiced the protesters. The GAO must, however, show access to information before the presumption of prejudice can operate. "[A]n unfair competitive advantage is presumed to arise where an offeror posseses competitively useful nonpublic information that would assist that offeror in obtaining the contract, without the need for an inquiry as to whether that information was, actually, of assistance to the offeror." *L-3 Servs.*, B-400134.11, at 17 n.19

recommendation of the GAO was "misguided."  Instead, Turner believes that the Army focused almost exclusively on pressure from legislators.[49]

The government rejects Turner's argument that such a requirement exists. To support this, the government points to two decisions: that of the Federal Circuit in *Centech* and that of the Court of Federal Claims in *SP Systems*.  In *Centech* the Federal Circuit reaffirmed *Honeywell* and found that an agency's decision is rational if it follows a rational GAO decision.  *Centech Group v. United States*, 554 F.3d 1029, 1039 (Fed. Cir. 2009).  In *SP Systems*, the protester had latched onto the same language from *IMS Services* that Turner here quotes and had used that language to argue that an agency "'must perform [its] own analysis of whether the GAO is correct.'"  *SP Sys., Inc. v. United States*, 86 Fed. Cl. 1, 13 (2009).  The Court of Federal Claims rejected this argument and stated that it would continue to follow the "viable and applicable precedent" of *Honeywell*: "If the GAO makes a rational recommendation and the agency *simply implements that recommendation*, then the agency action itself has a rational basis. . . . [I]nquiring after the rationality *vel non* of the GAO decision is, where the agency action is solely based upon that decision, examining whether there exists a rational basis for the agency's acts."  *SP Sys.*, 86 Fed. Cl. at 14 (emphasis added).

The government is correct.  Precedent does not support plaintiff's argument that an agency must go through a separate evaluation process when considering whether to implement the GAO's recommendation.  In the normal course of events, agencies fully implement GAO recommendations, and the "fail[ure]" of an agency "to implement fully the recommendations" of the GAO is so serious that a report of this "failure" must be submitted to Congress.  31 U.S.C. § 3554(b)(3), (e)(1) (2009).  Neither *Honeywell* nor *Centech* nor any other binding case mentions a separate evaluation requirement.  In fact, the only two cases to mention this requirement are the two cited above—*IMS, Services*, where the requirement allegedly appeared in dicta, and the recent *SP Systems* that rejected the existence of any such requirement.  Finding that such a requirement exists would be at odds with our path of review in cases such as this one; as discussed above, this Court reviews the rationality of an implemented GAO recommendation because that decision "constitutes the very reason(s) for the agency action."  *Grunley Walsh Int'l, LLC. v. United States*, 78 Fed. Cl. 35, 44 (2007).  Furthermore, the administrative record in this case contains numerous documents and emails discussing the GAO decision and whether to implement it or waive the conflicts.  This Court will not rely on challenged dicta in a non-precedential, fifteen-year-old case to forge a new requirement.

---

[49] Turner's recent briefs have not contained much discussion of this point, and defendant and intervenors have made unrebutted arguments that the record is devoid of anything "to suggest that [Army personnel] were in any way concerned about Congressional inquiries from anyone . . . ."  Oral Arg. Tr. at 86.

C.     *The Agency was not Arbitrary and Capricious in Implementing the GAO Recommendation, Rather than Waiving the Conflicts.*

Apart from the Army's decision to follow the GAO recommendation, Turner also argues that the Army failed to adequately evaluate the OCI waiver request. According to Turner, the Army must "examine the relevant data and articulate a satisfactory explanation for its action" when deciding whether or not to seek a waiver. *F.C.C. v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) (quotations omitted). In this case, the record is replete with examples of the costs of reprocurement but contains scant evidence of the benefits of reprocuring the contract. Instead of making a decision based upon those costs—which could stretch to $100 million and involve great inconvenience for soldiers—plaintiff argues that the Army attempted to pick the action that would be "most defensible in litigation" and that would appease members of Congress who had contacted the Army about a waiver.[50]

The government responds that the decision to waive is entirely discretionary and need not be documented. Under the FAR, "[t]he agency head or designee *may* waive" an OCI and any such request must be made in writing. 48 C.F.R. § 9.503 (2009) (emphasis added). The record in this case indicates that the official, LTG Antwerp, with the ability to grant a waiver was advised that "[t]here is no requirement to create a record of why you did not grant a waiver . . . ."[51] The government also argues that the decision not to grant a waiver was entirely rational; the official in charge noted that he had to "balance [his] responsibilities to the competitive process . . . and [his] heart for service men and women, their families, and retirees who deserve the best medical care possible."[52] Towards this end, that official solicited substantive advice regarding the law on OCIs and waivers. The government also notes that plaintiff has failed to cite anything in the record that indicates the Army actually considered the input of legislators in making their decision to follow the GAO recommendation.

The government is also correct on this point. The FAR places the decision to waive an OCI squarely in the hands of the head of contracting activity, who "may" waive an OCI, if appropriate. 48 C.F.R. § 9.503. That language comports with the emphasis placed upon the agency's judgment in situations involving OCIs, and that discretionary language contains no hint of a requirement that an agency *must* waive or *must* document the reasons for a waiver decision. Furthermore, precedent from this court and the GAO has never discussed any such requirement but has always referred to waiver as merely one of several options that an agency *may* pursue. *See, e.g.*, *Filtration Dev. Co., LLC v. United States*, 63 Fed. Cl. 418, 422 (2005) ("In appropriate circumstances, the head of the contracting agency is empowered to waive an OCI . . . ."); *Nortel Gov't*

---

[50] Pl.'s Mot. J. 38.
[51] Admin. Rec. Tab 47.6, at 7073.
[52] Admin. Rec. Tab 31.1, at 6883.

*Solutions, Inc.*, B-299522.5 (Comp. Gen., Dec. 30, 2008), at 7 n.5 (noting that there are "situations" in which the FAR allows the head of contracting activity to waive an OCI); *Government Bus. Servs. Group*, B-287052 (Comp. Gen., Mar. 27, 2001), at 12 (noting that waiver is merely one of several courses that an agency could take, if an OCI were found). The only requirement contained in the text of the FAR is that, if a waiver is requested in writing, the "request and decision shall be included in the contract file." 48 C.F.R. § 9.504(e). Both of these are contained in the file.[53] Requiring the government to waive or to document their reasons for not waiving an OCI would also contravene the spirit of the regulations, which seek to reduce "unnecessary delays, burdensome information requirements, and excessive documentation" when dealing with OCIs. *Id.* § 9.504(e). Accordingly, the Court does not find the Army's waiver decision to be arbitrary and capricious.

D.    *Plaintiff Requests a Permanent Injunction.*

Turner requests that the Court issue a permanent injunction ordering restoration of Turner's contract for the Hospital project and barring the Army from re-procuring the contract to anyone else. The Tucker Act grants this court the power to award "any relief that the court considers proper, including declaratory and injunctive relief," in bid protest cases. 28 U.S.C. § 1491(b)(2). A permanent injunction is an "extraordinary remedy." *Heritage of Am., LLC v. United States*, 77 Fed. Cl. 66, 78 (2007). Before granting one, a court must consider four factors: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004). *See also Centech Group, Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). As discussed above, Turner has succeeded on the merits of its claim that the Army was arbitrary and capricious in implementing the GAO recommendation, since the GAO failed to adhere to the appropriate standard of review. The first factor thus favors plaintiff.

Under the second factor, a party seeking a permanent injunction must demonstrate that it will suffer irreparable harm without the desired relief. Lost profits can constitute irreparable harm when the litigant has no action against the United States for those profits. *See Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319 (2009). Furthermore, the loss of the chance to compete for a contract also can constitute irreparable harm. *See Magnum Opus Techs. v. United States*, 2010 WL 2255523, at *27 (Fed. Cl., May 28, 2010) (finding that being deprived of the chance to compete for a procurement constitutes irreparable harm); *Mission Critical Solutions v. United States*, 91 Fed. Cl. 386, 411 (2010) (finding irreparable harm where plaintiff would be unable to be considered for an award);

---

[53] Admin. Rec. Tab 18.1 (waiver request); Admin. Rec. Tab 56 (waiver denial).

*Overstreet Elec. Co., Inc. v. United States*, 47 Fed. Cl. 728, 743–44 (finding that a "lost opportunity to compete in a fair competitive bidding process for a contract" constitutes irreparable harm). In this case, Turner has been stripped of a $300 million contract and been barred from competing in the re-procurement of that contract. This constitutes irreparable harm, and the factor favors plaintiff.

Under the third factor, the Court must balance the harms to the parties. As mentioned above, Turner will be denied the benefit of the contract. Furthermore, the Administrative Record shows that re-procurement of the contract could be quite costly; the South Atlantic Division of the Army Corps of Engineers estimated that re-procurement to McCarthy/Hunt or Harbert/Gorrie would likely incur additional costs of between $84 million and $125 million, as well as delay the project for 16 months.[54] In contrast to that, the government argues that the integrity of the procurement process itself will be damaged if a firm can hide a conflict and then reap the benefit of the award. The facts of this case do not support the government's contention that any conflict was hidden. In July 2008, [***] learned that AECOM and several other bidders *might* be interested in negotiating to acquire EB. The next month, [***] attended an Industry Forum where he learned that EB *might* be interested in competing on a government contract that AECOM held a design contract for. After this forum, [***] was informed that AECOM and EB had terminated negotiations. When he discovered that negotiations had resumed, he immediately contacted the Army. The CO did not find a hint of subterfuge in [***] actions, and the Court agrees with her and finds that this factor favors plaintiff.

The fourth factor requires the Court to consider the public interest. "There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Hospital Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005). The government argues that the public interest weighs in favor of a procurement process devoid of any taint of impropriety, while Turner argues that the actual taint stems from a procurement process infected by arbitrary and capricious decisions. The Court agrees with Turner. In this case, the Army followed a GAO decision based on flimsy evidence and an application of an erroneous standard of review. Letting such a decision stand would shake confidence in the procurement process, which is based on regulations and known standards of review, and chill firms from expending the substantial costs necessary to compete for government contracts. This factor also favors plaintiff.

III.    Conclusion

The Court must be guided by the applicable standard of review. That standard requires the Court to ascertain whether the Army acted arbitrarily and

---

[54] *See* Admin. Rec. Tab 44, at 7013. If the Army initiated an entirely new procurement, with a new RFP, the delays and costs would increase even more. *Id.*

capriciously in implementing the GAO's decision.  To assess this question, the Court must address the "controlling inquiry" of whether the GAO decision was "rational."  **Honeywell, Inc. v. United States**, 870 F.2d 644, 647 (Fed. Cir. 1989).  As discussed above, the GAO conducted a *de novo* review of the record without giving the contracting agency the deference it was due.  The Court therefore holds that the Army was arbitrary and capricious in implementing the GAO's decision, stripping Turner of the contract for the Hospital, and barring Turner from the re-procurement.    Accordingly, Plaintiff's Motion for Judgment on the Administrative Record is GRANTED as to the claim that the Army acted arbitrarily and capriciously in this regard, while defendant's and intervenors' cross-motions are DENIED as to this claim.

The Court, however, also holds that the Army was not arbitrary and capricious in not waiving the OCI, since the FAR commits that decision to the discretion of the agency.  In addition, the Court holds that the Army was not required to conduct a "full and independent" evaluation of the GAO recommendation before implementing it, since such a requirement would conflict with binding precedent.  Accordingly, Plaintiff's Motion for Judgment on the Administrative Record is DENIED as to these claims, while defendant's and intervenors' cross-motions are GRANTED as to these claims.

Furthermore, because the balance of permanent injunction factors favors Turner, plaintiff's request for a permanent injunction is GRANTED.  The Court hereby ORDERS the Army to restore the Hospital contract to Turner and not re-procure the contract to another firm.  The Clerk shall enter judgment in accordance with this Opinion.  No costs.

IT IS SO ORDERED.

**_____s/Bohdan A. Futey_____**
**BOHDAN A. FUTEY**
**Judge**